## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| B&Z Auto Enterprises, LLC d/b/a/ | : | |
| Riverdale Chrysler Jeep d/b/a | : | |
| Eastchester Chrysler Jeep Dodge d/b/a | : | |
| New York Cars Direct d/b/a New York | : | **CIVIL ACTION FILE NO.** |
| Autos Direct, and on Behalf of All | : | |
| Others Similarly Situated, | : | _____ |
| | : | |
| Plaintiff, | : | **Jury Trial Demanded** |
| | : | |
| vs. | : | |
| | : | |
| AutoTrader.com, Inc., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CLASS ACTION COMPLAINT

Plaintiff B&Z Auto Enterprises, LLC d/b/a/ Riverdale Chrysler Jeep d/b/a Eastchester Chrysler Jeep Dodge d/b/a New York Cars Direct d/b/a New York Autos Direct, individually and on behalf of a Class defined below, alleges the following against AutoTrader.com, Inc. ("AutoTrader" or "Defendant"), based upon personal knowledge with respect to itself and upon information and belief derived from, among other things, Plaintiff's Counsel's investigation and review of publicly available information as to all other matters.

KH383622.DOCX 2

## I.    <u>NATURE OF THE CASE</u>

1.     AutoTrader operates a digital automotive marketplace in the United States and boasts as having 18.5 million unique visitors monthly with average daily vehicle listings of 4.4 million.   AutoTrader's dealer customers subscribe to premium listings and enhanced services to upgrade their automobile listings on AutoTrader's website.

2.     AutoTrader's future growth is dependent upon increasing the amount its dealer customers spend.  To this end, as part of the sale of advertisements and services to its dealer customers, AutoTrader provides AutoTrader's dealer customers with detailed data and analytic reports to identify additional premium listings and services for dealer customers.  AutoTrader is dependent on conveying to its dealer customers the value of AutoTrader's premium listings and enhanced services.  AutoTrader does this through the detailed data and analytic reports it provides to dealer customers.

3.     However, prior to July 2015, unbeknownst to its more than 20,000 dealer customers, the data and analytic reports AutoTrader provided to its dealer customers for years contained inflated performance numbers.  Accordingly, the "value" AutoTrader's dealer customers were led to believe was provided by AutoTrader's premium listings and enhanced services, was inflated.

4.     AutoTrader's dealer customers, including Plaintiff and members of the Class, subscribed to, and continued to subscribe to, AutoTrader's premium listings and enhanced services based on inflated performance numbers.  Because the performance numbers were inflated, the prices AutoTrader's dealer customers, including Plaintiff and members of the Class, paid for the premium listings and enhanced services that were inflated.

5.     AutoTrader uses "dealer churn" as an indicator of dealer satisfaction and success of AutoTrader's sales and marketing efforts.  The low dealer churn rates achieved by AutoTrader, however, were driven by inflated performance numbers reported to its dealer customers.

6.     AutoTrader reported inflated performance numbers to its dealer customers at the same time it was attempting to conduct an initial public offering of AutoTrader stock.  After the proposed initial public offering of AutoTrader stock was withdrawn, AutoTrader's founding CEO resigned, and AutoTrader's parent company bought back the 25% stake it had sold to an investment fund, AutoTrader quietly corrected the performance numbers reported to its dealer customers.  AutoTrader did so without disclosing to dealer customers that prior numbers had been inflated in the first place and, instead, attempted to obfuscate the reason for the sudden decline in the reported numbers.  To this day, AutoTrader

has not publicly admitted that the performance numbers it reported to its dealer customers for years were drastically inflated.

7.     Plaintiff and members of the Class sustained economic losses as a result of AutoTrader's reporting of overstated performance numbers, by entering into subscription agreements for premium listings and enhanced services, refraining from cancelling those agreements, and over-paying for the premium listings and enhanced services.

## II.     THE PARTIES

### Plaintiff

8.     Plaintiff B&Z Auto Enterprises, LLC d/b/a/ Riverdale Chrysler Jeep d/b/a Eastchester Chrysler Jeep Dodge d/b/a New York Cars Direct d/b/a New York Autos Direct ("B&Z" or "Plaintiff") is a corporation organized and existing under the laws of the State of New York with its principal place of business located in Bronx, New York.   B&Z is engaged in the business of buying and selling automobiles and trucks.   In June 2010, B&Z entered into an agreement with AutoTrader to purchase premium listings and/or enhanced services on AutoTrader's website.   B&Z subscribed to AutoTrader's premium listings and/or enhanced services – and refrained from terminating its agreement with AutoTrader – in reliance on AutoTrader's representations regarding the effective reach of the

advertising that AutoTrader purportedly provided.  B&Z would not have purchased AutoTrader's premium listings and/or enhanced services, maintained its subscription, agreed to the prices paid for the subscriptions to premium advertisement listings, and/or would have immediately thereafter terminated its agreement with AutoTrader had AutoTrader accurately reported the advertising reach and effectiveness statistics to Plaintiff B&Z.

## **Defendant**

9.      Defendant AutoTrader.com, Inc. is a Delaware corporation based in Atlanta, Georgia.   AutoTrader is a subsidiary of AutoTrader Group, Inc., a Delaware corporation, which is majority owned by Cox Automotive, Inc.  Cox Automotive, Inc. is an operating subsidiary of Cox Enterprises, Inc., a privately-held Delaware corporation with its principal place of business in Georgia. AutoTrader operates the largest digital automotive marketplace in the United States.

## III.   **JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  The amount in controversy exceeds $5 million exclusive of interest and costs.  At least one Plaintiff and one

Defendant are citizens of different states.  There are more than 100 putative class members.

11.    This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Georgia, regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia.  Defendant intentionally avails itself of this jurisdiction by marketing and selling advertisement listings and services from Georgia to tens of thousands of dealer customers nationwide.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is in this District and a substantial part of the events, acts, or omissions giving rise to Plaintiff's claims occurred in this District.

13.    AutoTrader's standardized agreements with its dealer customers include a choice of venue clause specifying that the agreement is to be construed under the laws of the State of Georgia, without reference to its conflicts of law principles, and further designates that the parties consent to the exclusive jurisdiction and venue of the state and federal courts in Fulton County, Georgia.

## IV.   FACTS COMMON TO ALL COUNTS

### AutoTrader Touts Itself As Being The
### Most Visited Car Shopping Website

14.     Founded in 1997 and launched in 1998, AutoTrader operates a digital automotive marketplace and is a leading provider of marketing and software solutions to automotive dealers in the United States.

15.     AutoTrader has over 20,000 automobile dealer clients and boasts of having 18.5 million unique visitors monthly with average daily vehicle listings of 4.4 million, according to its company website.

16.     "Autotrader has the most unique visitors monthly and drives more buyers to dealerships than any other third-party automotive website. Our comprehensive view of the marketplace provides proprietary market insights to help dealers improve their operational efficiency and inform their decisions," according to AutoTrader's website.

17.     According to a study conducted by AutoTrader in 2011 and cited in its 2012 Prospectus (defined below), dealer customers can reach 60% of online in-market car shoppers in the United States through AutoTrader.

## AutoTrader's Repeated Attempts to Go Public

18.     Three years after its founding, AutoTrader filed a registration statement with the U.S. Securities and Exchange Commission ("SEC") in April 2000 for an initial public offering ("IPO") of stock valued at $65 million.

19.     In November 2000, AutoTrader withdrew that registration statement, citing market conditions as the reason for not proceeding with the IPO of AutoTrader stock.

20.     In June 2010, AutoTrader's parent company, Cox Enterprises, Inc., sold a 25% stake in AutoTrader to Providence Equity Partners LLC ("Providence"), according to the 2012 Prospectus (defined below).

21.     On April 30, 2012, AutoTrader amended its senior secured credit facilities to, among other things, provide $400 million of additional borrowing capacity, which AutoTrader used to pay a special cash dividend to its stockholders, who at the time consisted primarily of Cox Enterprises, Inc. and Providence.

22.     In May 2012, AutoTrader's primary shareholders, Cox Enterprises, Inc. and Providence, formed AutoTrader Group, Inc., according to the 2012 Prospectus (defined below).   AutoTrader merged into AutoTrader Group, Inc., becoming a subsidiary of AutoTrader Group, Inc. ("AutoTrader Group"), in anticipation of an initial public offering of AutoTrader Group stock.

23.     AutoTrader Group filed a registration statement with the SEC on June 15, 2012 for a proposed IPO of AutoTrader Group stock valued at $300 million and filed amended registration statements in July-November 2012 (collectively the "2012 Prospectus").  The net proceeds of the IPO were to be used to repay indebtedness under its senior secured credit facilities and for other general corporate purposes.

24.     According to the 2012 Prospectus, AutoTrader Group had profits of $68.1 million on $1.02 billion in revenue in 2011.

25.     AutoTrader Group ultimately withdrew the 2012 Prospectus in January 2013 and abandoned the initial public offering, citing market conditions as the reason for not proceeding.

26.     Several months later, AutoTrader's long-time CEO, Chip Perry, resigned effective May 1, 2013.  Perry had been AutoTrader's only CEO since the company began operating in 1997.

27.     Perry was succeeded as CEO of AutoTrader by Sandy Schwartz, President of Mannheim, AutoTrader's sister company also owned by AutoTrader Group.

28.     In January 2014, Cox Automotive repurchased the 25% stake in AutoTrader Group it had sold to Providence in 2010 in a deal that implied a value

of $7 billion for AutoTrader Group, according to a January 2, 2014 report in the Wall Street Journal.

29.    AutoTrader Group's stock is 98% owned by Cox Automotive, which is a subsidiary of Cox Enterprises, a privately owned company which has revenues of more than $17 billion.

## AutoTrader's Business

30.    Automotive advertising is among the largest advertising markets in the United States, with more than $22 billion expected to be spent on automotive advertising in 2012, according to Forrester Research cited in the 2012 Prospectus.

31.    According to the 2012 Prospectus, "[a]s of June 30, 2012, [AutoTrader] estimate[s] approximately 70% of franchise dealers and 30% of independent dealers subscribed to [its] digital media solutions."

32.    According to the 2012 Prospectus, AutoTrader cultivates its dealer relationships by building what it believes is the largest dealer sales force in the U.S. retail automotive industry, with over 1,400 highly trained, consultative sales and support professionals.

33.    AutoTrader utilizes a "freemium" model whereby it provides dealer customers the ability to list their automobiles for free on its website, according to the 2012 Prospectus, but dealer customers can pay for higher placement of their

listings on search results on Autotrader.com, under a so-called "pay for placement" model:

> We offer online classified listing placements on both AutoTrader.com and KBB.com. We sell these listings as monthly, recurring subscriptions to independent and franchise dealers for both new and used cars. We employ a "pay for placement" model that allows subscribing dealers to achieve higher placement of their listings on our search results page. There are several tiers of listings for a subscribing dealer, including standard, featured and premium. The higher priced listing packages offer higher listings placement and more listings features, including vehicle photos, a secure credit application, a link back to the dealer's website, video capability and bundled display add-ons such as our Alpha and Spotlight services. We estimate that premium listings, which populate the higher and more visible section of the page, typically generate two to three times as much vehicle exposure and consumer responses as featured listings, which in turn are typically eight to nine times more effective than our free standard listings.

34.     Over 20,000 dealers subscribe and pay for featured and premium listings on AutoTrader's websites, according to the 2012 Prospectus. Standard tier listings are free to dealers.

35.     AutoTrader also sells a la carte advertising enhancements, according to the 2012 Prospectus:

> We offer additional features for classified listings that can be purchased on an on-going or episodic basis, including Alpha and Spotlight placements. These are prominently visible interactive advertising positions across the top of a search results page and allow consumers to view multiple cars in the advertising dealer's inventory. Our Alpha service allows a dealer to purchase the top advertisement spot on a search results page; it is an interactive advertisement which

allows the consumer to view multiple cars in that dealer's inventory and these placements are sold by local region (zip code) so that consumers only see Alpha advertisers in their vicinity, allowing the advertising dealer to dominate the page.  Spotlight placements are located below Alpha services and above all other search results and these listings are presented to consumers on our search results page based on their desired search radius.

36.    Prospective vehicle buyers are permitted free access to the AutoTrader websites.  Prospective vehicle buyers specify certain parameters from which AutoTrader's websites software conducts a search of the database of vehicles listed for sale by automobile dealer customers of AutoTrader.  The search parameters prospective automobile buyers may choose include, but are not limited to, the year, make, model and trim of the vehicle sought, as well as the geographic location of the dealers and/or sellers of such vehicles.

37.    AutoTrader's website's software returns search results to prospective vehicle buyers in the form of a list showing all vehicles for sale within its database that meet the prospective vehicle buyer's search parameters. This is known as the "Search Results Page" ("SRP").

38.    Alpha and Spotlight advertisements are at the top of the SRP, followed by dealers subscribing to premium listings package, then featured, then standard, according to the 2012 Prospectus.   Premium listings include a

description, photos, video, dealer contact information and a link to the dealer's website.

39.   AutoTrader SRPs appear as follows:



40.   Once a potential car buyer clicks on a listing, they see the Vehicle Display Page ("VDP"), where the potential care buyer can see an updated listing price, detailed dealer contact information, more photos, video and descriptive

information, and a form to fill out to contact the dealer, according to the 2012

Prospectus.

41.   AutoTrader VDPs appear as follows:



## AutoTrader's Agreements With Automobile Dealers

42.     AutoTrader sells "subscriptions" for featured and premium advertising listings to automobile dealerships throughout the United States by way of an Advertising Sales Order which is subject to Standard Terms and Conditions in the Advertiser Relationship Agreement ("Agreement").

43.     Subscription Sales Orders remain in effect for one year and automatically renew for successive one-year periods.  An automobile dealer client may cancel the Agreement at any time by providing 30 days prior written notice to AutoTrader.

44.     As set forth in the Advertiser Relationship Agreement, v7.21.09, paragraph 4:

> Unless a Subscription Sales Order explicitly specifies a particular limited term, each Subscription Sales order will commence on the Start Date and will remain in effect for one year ("Initial Term"), then will automatically renew for successive one-year periods (each a "Renewal Term").  Advertiser may cancel this Agreement (and/or any or all outstanding Sales Orders) at any time by providing 30 days prior written notice to ATC….

45.     Given that dealer customers may terminate the Agreement at any time by providing thirty days' notice, the Agreement between AutoTrader and automobile dealers is effectively a month-to-month agreement.

46.     Automobile dealers pay AutoTrader monthly either by credit card or by invoice payable within thirty days.

47.     Subscription fees typically range from $660 to $7,068 per month and can be as high as $42,975 per month per dealer, according the 2012 Prospectus.

### AutoTrader Tracks Search Results and Vehicle Detail Page Hits And Communicates These Performance Numbers To Dealer Customers Via Monthly "Dealer Scorecards"

48.     In conjunction with the sale of advertisement listings to dealer customers, AutoTrader tracks and reports to dealer customers the number of times a particular dealer's vehicles are included in a prospective vehicle buyer's search results on a Search Result Page (SRP).

49.     Upon information and belief, AutoTrader only counts a vehicle appearing in search results as SRP if the actual page on which the vehicle is listed is viewed by the potential buyer.  That is, AutoTrader does not count as an SRP instance in which a vehicle appears in search results, if, for example, a vehicle is listed on page three of search results, but the prospective vehicle buyer only clicks through to page two of the search results.

50.     AutoTrader draws an analogy in its marketing materials between the number of times a dealer's vehicles appear in SRPs and the number of times

prospective vehicle buyers would have physically visited the dealership under the old "brick and mortar" era.

51.   AutoTrader focuses on the SRP metric as the key indicator of the value that dealers receive for purchasing AutoTrader's advertising listings in its marketing efforts with dealer customers.

52.   AutoTrader also tracks and reports to dealer customers the number of times prospective buyers "click" on Vehicle Detail Pages (VDP).   VDP performance numbers reflect the number of times prospective buyers actually "click" on a particular vehicle that appears in vehicle search results in order to view all of the details of the vehicle, including options, pricing, terms, photographs, etc.   In the internet industry, this metric is analogous to the "click through" rate.

53.   The VDPs counted for a particular dealer are a subset of its SRPs, because not every vehicle that appears in a SRP will be "clicked" by the prospective buyer.

54.   AutoTrader draws an analogy in its marketing materials between VDPs and the number of times prospective vehicle buyers would have physically visited the dealership and inquired about a specific vehicle for sale in the classic "brick and mortar" era.

55.     On or about the fifth (5th) day of the month following each dealer's first month of advertising on AutoTrader's online platform, AutoTrader communicated to dealers throughout the Class Period what AutoTrader represented to be accurate metrics reflecting the advertising reach that the dealer had purportedly achieved through AutoTrader's online platform during the relevant month and/or prior months.

56.     The communication of dealers' advertising reach results was in the form of a report created by AutoTrader which is called a "Dealer Scorecard," as well as a spreadsheet referred to as a "Performance Tracker," which compared the current month's SRPs and VDPs to those of prior months.

57.     On or about the fifth (5th) day of every month from the time each dealer's first month as an AutoTrader customer throughout the Class Period, AutoTrader continued to send, via e-mail, in substantially the same form, monthly Dealer Scorecards and/or Performance Tracker Reports to dealer customers.  The Dealer Scorecard and Performance Tracker were also available to dealers online at AutoTrader's website.

### AutoTrader Used Performance Numbers To Upsell Dealer Customers To Paid Subscription Advertising Listings

58.     The 2012 Prospectus explains that AutoTrader regularly meets with

dealer customers to review performance:

> Our sales force **regularly meets with our dealer customers to review their performance and to optimize their presence on our websites and their use of our software solutions.** We operate a broad digital platform to pursue opportunities in the large automotive vertical. Our success is driven by the combination of our leading sales force, significant and recurring investment in our brands, on-going software product innovation, proprietary data and analytics and our ability to connect over 25,000 dealers with the most in-market car shoppers. [emphasis added]

59.     The 2012 Prospectus also explains that AutoTrader provides dealer

customers with "detailed data and analytic reports" to "help them understand the

effectiveness" of AutoTrader's advertisement listings:

> we provide our dealer customers with **detailed data and analytic reports that, for example, help them understand the effectiveness of their classifieds listings** when compared to other dealers in their market and around the country. The sales team uses this data to help customize the use of their services and identify additional services that can benefit them. On average, members of our team contact each dealer customer approximately twice per month. [emphasis added]

60.     AutoTrader used the detailed and analytic reports to "upsell" dealer

customers to purchase premium listings and enhanced services.

## AutoTrader Reported Inflated SRP and VDP
## Numbers To Dealers Customers

61.     Prior to reports for June 2015 transmitted to dealers in July 2015, the SRP metrics reported to Plaintiff and the Class in Dealer Scorecards and other communications were inflated above the SRPs dealers had actually received.

62.     Prior to reports for June 2015 transmitted to dealers in July 2015, the VDP metrics reported to Plaintiff and the Class in Dealer Scorecards and other communications were inflated above the VDPs dealers had actually received.

63.     Upon information and belief, AutoTrader's system was programmed by AutoTrader such that it over-counted the number of SRPs viewed by prospective buyers for certain types of search inquiries.

64.     Upon information and belief, AutoTrader's system was programmed by AutoTrader such that it over-counted the number of VDPs viewed by prospective buyers for certain types of "click throughs."

65.     According to a former AutoTrader employee in Atlanta in charge of client services, training and communications from 2005 until 2009, over-counting was taking place in 2007 when it was discussed during a video conference between the Atlanta and Florida offices.  The former employee was present when a team was drawing on a whiteboard in a manager's office in Atlanta and discussing information going to a type of "dashboard" and the team discovered that

AutoTrader was over-counting. The former employee questioned the over-counting at the time in 2007, but was told it was due to the merger of the multiple systems for AutoTrader Magazine, AutoTrader.com and other systems, and it was basically none of the former employee's business.

66.     The reports to the dealers were always off, according to a former business development executive with AutoTrader from 2007 to 2014. AutoTrader had acquired V Auto and the VDPs at V Auto never matched the VDPs from AutoTrader, according to their former business development executive. AutoTrader told staff to talk on the phone and not in e-mails, according to the former business development executive.

67.     A former AutoTrader employee on the private seller side from 1997 to 2014kris knew by 2010 that the numbers were not being reported correctly and AutoTrader was looking into how to get accurate numbers. Different systems were showing different numbers -- the numbers were not consistent across the board as one would expect, according to the former employee. The former employee met with an analytics person who explained how there were variances in the reporting systems. There were internal and external systems that tracked all kinds of metrics, according to the former employee.

68.    AutoTrader either had actual notice that its systems inflated the number of SRPs and VDPs recorded for its dealer customers, or should have known, upon exercise of reasonable diligence, that its systems inflated the number of SRPs and VDPs recorded for its dealer customers.

69.    Each of the monthly Dealer Scorecards and/or Performance Tracker Reports sent by AutoTrader to Plaintiff and the Class during the Class Period contained the above-described misrepresentations as to the uniformly inflated number of SRPs and VDPs that the dealer customers were receiving from AutoTrader's online listings.

70.    Despite AutoTrader's knowledge, or failure to exercise reasonable diligence to assure accuracy, that its systems inflated the number of SRPs and VDPs recorded for its dealer customers, including the Plaintiff and the Class, AutoTrader used that inaccurate and misleading SRP and VDP data to "upsell" dealer customers to purchase featured and premium listings and as the basis for its monthly Dealer Scorecard report to its dealer customers, including Plaintiff and the Class, during the Class Period.

71.    According to multiple former AutoTrader sales consultants from throughout the United States, dealers repeatedly questioned the accuracy of the

SRP and VDP numbers reported to them, but were assured that AutoTrader accurately tracked the SRP and VDP numbers.

72.    A former sales consultant with AutoTrader from 2007 to 2009 received constant complaints from dealers saying, for example, there's no way they had that amount of traffic.

73.    A sales consultant with AutoTrader from 2004 to 2013 received considerable feedback from dealers who were constantly challenging the numbers being reported by AutoTrader.

74.    According to a circulation manager for AutoTrader Magazine from 2003 to 2009, salespeople used to talk during meetings about the fact that over-reporting of hits on the AutoTrader website could cause issues with the salespeople's accounts.

75.    According to a former sales consultant with AutoTrader from 2013 to 2014, "a lot of dealers" told the sales consultant there was no way they were getting as many searches and page views as were indicated in the reports the sales consultant provided to the dealers.

76.    A former sales consultant with AutoTrader from 2013 to 2014, who heard doubts from dealers regarding the numbers reported, would explain to the dealers that the numbers were generated by AutoTrader's system and there was no

way they were being manipulated.  The former sales consultant took the dealers' complaints about the numbers to managers, but was simply told reports don't lie. Instead, managers blamed the dealers, indicating that dealers had to do a better job of capturing the potential buyers.

77.    Defendant communicated the aforesaid misleading, inaccurate and grossly overstated monthly SRP and VDP results to its dealer customers, including Plaintiff and members of the Class, to induce the dealer customers to subscribe to, and continue subscribing to and paying for, AutoTrader's premium listings and enhanced services.

78.    The 2012 Prospectus states the importance to AutoTrader of keeping dealers as subscribing customers under a section titled "Dealer Churn":

> We review dealer churn, which we define as the total number of subscribing dealers that are no longer customers at the end of a given month divided by the number of subscribing dealers at the beginning of that month.  **We believe dealer churn is a good indicator of dealer satisfaction with our solutions and the success of our sales and marketing efforts.**  In 2011 and for the six months ended June 30, 2012, our average monthly dealer churn was 1.6% and 1.8%, respectively. Prior to the fourth quarter of 2011, we tracked dealer churn for only AutoTrader.com subscribing dealers.  We do not track dealer churn in our Software Solutions business.  [emphasis added]

79.    The low dealer churn was possible due to the reporting of inflated performance numbers to dealer customers.

80.    According to the 2012 Prospectus, AutoTrader's future growth depends on its ability to sell dealer customers on premium listings and enhanced services:

> Our future growth will depend in part on our ability to successfully increase the amount that each of our dealer customers spends on our digital media solutions.  We have made a substantial investment in our sales organization, and we are dependent on the success of that organization in helping our subscribing dealers see the value and the return on investment of our premium listings and our enhancement services.

81.    Reporting inflated performance numbers to dealer customers permitted AutoTrader to sell dealer customers on its premium listings and enhanced services, which in turn drove AutoTrader's growth.

### Over-Counting Revealed And AutoTrader Continues to Report Inflated Numbers To Dealerships

82.    Unbeknownst to AutoTrader's dealer customers, AutoTrader's systems over-counted dealer customers' SRPs and VDPs for at least five years, thereby resulting in AutoTrader's communication of false and inaccurate online advertising results to the Plaintiff and members of the Class.

83.    According to a former sales consultant in the New York and New Jersey area with AutoTrader from 2011 to 2015, in January 2015, management notified AutoTrader sales consultants that prior years' reporting was wrong due to inflation of SRPs and VDPs.

84.     However, even after informing sales consultants that the SRPs and VDPs reported to dealer customers were inflated, AutoTrader continued to disseminate, via e-mail, the false and misleading performance numbers in Dealer Scorecards to dealer customers, including Plaintiff and members of the Class, from January 2015 through June 2015.

## AutoTrader Finally Corrects Inflated Numbers And Numbers Plummet

85.     Upon information and belief, at some time between December 2014 and June 2015, AutoTrader corrected its system such that it no longer over-counted certain SRPs and/or VDPs.

86.     In early July 2015, AutoTrader sent Dealer Scorecards to Plaintiff, and other dealer customers, for June 2015 via e-mail.  The Dealer Scorecards reflected a precipitous decline of between 40% and 60% in SRPs and VDPS from the same month of the previous year, as well as a significant decline from the immediately prior months.  This decline applied to dealer customers across the board, upon information and belief.

87.     Unbeknownst to dealer customers, the severe decline in dealer customers' advertising reach in June 2015, as reflected in the SRPs and VDPs that AutoTrader reported, was, upon information and belief, a result of the

reprogramming of AutoTrader's counting systems in or about May 2015 such that the systems were no longer over-counting certain results pages.

## Defendants Try to Hide and Minimize The Over-Counting

88.     Since 2010, AutoTrader has held mid-year all-company town hall meetings via a live webcast in addition to annual January all-employee meetings, according to an article titled "Town Halls Go Virtual at AutoTrader.com" published January 25, 2011 in Ragan's PR Daily Europe.

89.     The town hall meetings consisted of 30-minute presentations each by AutoTrader's president and executive vice president, followed by a 30-minute live Q&A session in which employees could send anonymous questions, according to the Ragan's PR Daily Europe article.

90.     AutoTrader held such a mid-year town hall meeting via live webcast during the summer of 2015.

91.     During the summer of 2015, AutoTrader's President was Jared Rowe.

92.     During the summer 2015 town hall meeting, employees submitted multiple questions regarding the drop in SRP and VDP numbers, according to a former sales consultant with AutoTrader from 2011 to 2015.   In response, AutoTrader executives acknowledged that SRP and VDP numbers reported to dealer customers had previously been over-counted.   Attempting to minimize the

significance of the over-counting, the executives told employees that the problem had been corrected moving forward.

93.     Rather than admitting that prior numbers had been inflated, AutoTrader sales consultants were instructed by management to advise dealer customers of ways they could increase their numbers, thereby, attempting to put the blame on dealer customers for the decline.

94.     According to a former sales consultant with AutoTrader from 2011 to 2015, AutoTrader introduced something known as the "360 Report." AutoTrader sales consultants could input information for a particular dealer customer and the 360 Report would act as a guide for discussions with the dealer customer regarding how it could improve its performance. The true purpose for the 360 Report, however, was to respond to dealer customer questions regarding the plummet in reported SVP and VDP numbers without disclosing that the previously-reported numbers had in fact been overstated.

95.     According to the former sales consultant with AutoTrader from 2011 to 2015, and consistent with Plaintiff's experience, instead of disclosing to dealer customers that the SVP and VDP number reported to dealer customers prior to June 2015 had been overstated, AutoTrader instead attempted to put the blame for the decline in the SVP and VDP numbers on the dealer customers, even though the

dealer customers had not changed anything they were doing, by counseling dealer customers on ways they could improve their advertising performance.

## V.   CLASS ALLEGATIONS

96.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(2) and 23(b)(3), on behalf of itself and all others similarly situated as members of the following nationwide class ("Nationwide Class"), on their claims as purchasers of subscription advertisement listings from AutoTrader.

97.    The proposed Nationwide Class is defined as follows:

**Nationwide Class:**  All dealer customers located in the United States who purchased subscription advertisement listings from AutoTrader between June 1, 2010 and June 30, 2015 inclusive.

98.    As alleged herein, AutoTrader is headquartered in Atlanta, Georgia, its data processing operations are located in Atlanta, Georgia, and the employees charged with making decisions concerning the reporting of SRP and VDP numbers to dealer customers are located in Atlanta, Georgia.   AutoTrader's conduct resulting in the reporting of inflated SRP and VDP numbers to dealer customers took place exclusively, or primarily, in Georgia.   Accordingly, this Court has general jurisdiction over AutoTrader and original jurisdiction over Plaintiff's claims.  Applying, Georgia law nationwide, therefore, comports with due process.

used

note:

99.   AutoTrader's standardized agreements with its dealer customers includes a choice of venue clause, specifying that the agreement is to be construed under the laws of the State of Georgia, without reference to its conflicts of law principles, and further designates that the parties consent to the exclusive jurisdiction and venue of the state and federal courts in Fulton County, Georgia. Applying Georgia law nationwide, therefore, comports with due process.

100.   Alternatively, Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(2) and 23(b)(3), on behalf of itself and all others similarly situated as members of separate statewide classes (the "State Classes"), on their claims as purchasers of subscription advertisement listings from AutoTrader.

101.   Each State Class is defined as follows:

**State Class:**  All dealer customers located in [State] who purchased subscription advertisements from AutoTrader between June 1, 2010 and June 30, 2015 inclusive.

102.   The Nationwide Class and the State Classes are referred to herein as the "Class."

103.   Excluded from the Class are:  (A) Defendants, including any entity or division in which Defendant has a controlling interest, as well as their agents, representatives, officers, directors, employees, trustees, parents, children, heirs,

assigns, and successors, and other persons or entities related to, or affiliated with Defendant; (B) the Judges to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities.

104.   Plaintiff reserves the right to amend the Class definition/s if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

105.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

106.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

107.   The Nationwide and State Class meet the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2), and (b)(3) for the following reasons:

## Numerosity and Ascertainability

108.   The proposed class includes tens of thousands of dealer customers whose SRP and DVP numbers were over-stated.  While the precise number of

Class members has not yet been determined, the number of dealer customers indicates that joinder of each member would be impracticable.

109.   Membership in the Class is ascertainable based upon the records maintained by AutoTrader.  The names and addresses of the members of the Class are available in AutoTrader's records.  Notice can be provided to members of the Class through mass mailings, by publication, or by utilizing other means of communication as may be approved by the Court, subject to Federal Rule of Civil Procedure 23.

## Commonality and Predominance

110.   Common questions of law and fact exist and predominate over any questions affecting only individual Class members, and resolution of these common questions will resolve them for all Class members.   The common questions include:

    (a)    Whether AutoTrader engaged in the conduct alleged herein;

    (b)    Whether AutoTrader's systems artificially inflated performance numbers;

    (c)    Whether AutoTrader knew its reporting system artificially inflated performance numbers;

(d)     Whether AutoTrader reported over-stated performance numbers to Plaintiff and members of the Class;

(e)     Whether AutoTrader knew the performance numbers reported to Plaintiff and members of the Class were over-stated;

(f)     Whether Defendant's actions as described above violate the unfair and deceptive trade laws of the individual states specified herein;

(g)     Whether Plaintiff and members of the Class are entitled to recover actual damages and/or statutory damages;

(h)     Whether Plaintiff and members of the Class are entitled to damages, restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief; and

(i)     Whether Defendant has been unjustly enriched as a result of its misrepresentations.

## **Typicality**

111.   Plaintiff's claims are typical of the claims of the Class.  Plaintiff and Class members were injured through AutoTrader's uniform misconduct and their legal claims arise from the same core AutoTrader practices.  All Class member dealer customers were provided similar erroneous data in a substantially similar

form based in whole or in part upon a system-wide computer program or programs employed by AutoTrader.

## Adequacy of Representation

112.   Plaintiff is an adequate representative of the proposed Class because its interests do not conflict with the interests of the Class members it seeks to represent.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in litigating class actions and complex commercial disputes.  The interests of the Class will be fairly and adequately protected by Plaintiff and its counsel.

## Superiority

113.   A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Fed. R. Civ. P. 23(b)(3) because the expense and burden of individual litigation makes it economically infeasible for tens of thousands of Class members to seek redress for their claims other than through the procedure of a class action, and, in turn the lack of any other viable method for seeking redress would immunize AutoTrader's illegal and deceptive conduct.  Even if it were economically feasible, requiring tens of thousands of injured dealer customers to file individual suits would impose a burden on the court system and almost certainly lead to inconsistent judgments.

By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

114.   Class certification of the Class also is appropriate under Fed. R. Civ. P. 23(b)(2). AutoTrader has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

**COUNT 1**
**VIOLATION OF STATE UNFAIR AND/OR**
**DECEPTIVE TRADE PRACTICES ACTS**

115.   Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-114 above.

116.   Plaintiff brings this Count on behalf of the Nationwide Class under the Georgia Fair Business Practices Act, GA. CODE ANN. § 10-1-392, *et seq*., and, in the alternative, on behalf of the State Classes under state unfair and/or deceptive trade practices acts.

117.   By inaccurately inflating SRP and VDP performance numbers reported to Plaintiff, and, upon information and belief, members of the Classes, in its Dealer Scorecards and/ or Performance Tracker Reports, and by over-counting SRP and DVP's for all dealer customers, including Plaintiff and members of the

Class, AutoTrader engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state unfair and deceptive trade practices statutes listed below.  Defendant grossly overstated and inflated SRP and VDP performance numbers reported to dealers in Dealer Scorecards and Performance Trackers.

118.  As a result of the inflated SRP and VDP performance numbers by Defendant, the Plaintiff and members of the Class were induced to subscribe to and continue utilizing and paying a premium for AutoTrader's internet advertising listings, based on what Plaintiff and members of the Classes presumed were accurate SRP and VDP performance numbers.

119. AutoTrader's inflated the number of SRPs and DVPs, and Defendant's misrepresentations violated the following statutes proscribing consumer fraud and unfair and deceptive practices, the laws of which do not materially vary as relevant herein.

120.  Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of the Georgia Fair Business Practices Act, GA. CODE ANN. § 10-1-392, *et seq.*

121.   Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349, *et seq.*

122.   The acts, practices, misrepresentations and inaccurate reporting by AutoTrader described above and Defendant's dissemination of deceptive and misleading materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above statutes because each of these statutes generally prohibit deceptive conduct in consumer transactions.   Defendant violated each of these statutes by representing that its performance reports, including Dealer Scorecards and/or Performance Tracker Reports were accurate when, in fact, it provided inaccurate and misleading reports to dealer customers, including Plaintiff, as described herein.

123.   Dealer customers, including Plaintiff and members of the Class, are "consumers" within the meaning of each of the above statutes.

124.   Plaintiff and the members of the Class suffered a loss of money as a result of Defendant's misrepresentations because:  (a) due to the inflated SRP and VDP performance numbers of Defendant, Plaintiff not only continued utilizing and paying a premium for AutoTrader's internet advertising listings and it would not

have continued paying for such listings if the true facts concerning AutoTrader's inflated SRP and VDP performance numbers had been known, and (b) Plaintiff would not have purchased additional premium listings and/or enhanced services above AutoTrader's base internet advertising listings if the true facts concerning AutoTrader's inaccurate reporting had been known.

125. Defendants are liable to Plaintiff and the Nationwide Class for reasonable attorneys' fees and expenses of litigation incurred in connection with bringing this action under the Georgia Fair Business Practices Act, GA. CODE ANN. § 10-1-392, *et seq.*, and, in the alternative, to State Classes for reasonable attorneys' fees and expenses of litigation incurred in connection with bringing this action under state unfair and/or deceptive trade practices acts.

## COUNT 2
## BREACH OF IMPLIED WARRANTY

126. Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-125 above.

127. Plaintiff brings this claim individually and on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes.

128. A warranty of merchantability is implied by law in sales of goods, such as AutoTrader's internet advertisements forming the subject matter of this

action, and warrants that such goods pass without objection into the trade for sale of such goods.

129.   Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other members of the Class purchased AutoTrader's advertisement listings and executed an Agreement.  The Agreement includes a choice of law clause specifying that the Agreement is to be construed under the laws of the State of Georgia without reference to its conflict of law principle.  The terms of that contract include the promises and affirmations of fact made by Defendant in its marketing, advertising and promotion of its advertisement listings.   The Agreement and AutoTrader's marketing and advertising constitute warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and the members of the Class and Defendant.

130.   Defendant warranted in its marketing, advertising and promotion of its internet advertisements that it would track prospective vehicle purchasers' search results and provide accurate performance reports to Plaintiff and the Class.  These statements are untrue as detailed above, and the SRP and VDP performance numbers reported to Plaintiff and the Class over-counted the actual results, thereby overstating grossly and inflating the true numbers.   AutoTrader's Dealer

Scorecards and/ or Performance Tracker Reports fail to conform to its promised reporting procedures.

131.   All conditions precedent to Defendant's liability under this contract were performed by Plaintiff and the Class when they purchased subscriptions for AutoTrader's advertising listings and entered into an Agreement with AutoTrader. Plaintiff and the Class members paid AutoTrader monthly for its subscription listings, which remained in effect for one year and automatically renewed. Plaintiff and members of the Class maintained payments and followed their requirements under the Agreement.

132.   Defendant breached its warranties about its advertisement listings as they did not conform to Defendant's affirmations and promises, as described above.

133.   Defendant's advertisement listings did not pass into the trade "without objection" as they did not conform to its represented promise of providing accurate performance reports and additionally did not pass into the trade "without objection" as Plaintiff was provided inaccurate information regarding such reports.

134.   Plaintiff and the members of the Class were injured and are entitled to revocation of their acceptance as a direct and proximate result of Defendant's breach through its failure to deliver advertisement listings in conformance with its

promised specifications because:  (a) the SRP and VDP performance numbers reported to Plaintiff and the Class in the Dealer Scorecards and/ or Performance Tracker Reports were grossly overstated and inflated, thus the reports failed to meet AutoTrader's promised specifications; (b) they paid a price premium for Auto Trader's subscription advertisement listings; and (c) Auto Trader's subscription advertisement listings did not have the quality or value as promised.

**COUNT 3**
**BREACH OF CONTRACT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING**

135.  Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-134 above.

136.  Plaintiff brings this claim individually and on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes.

137.  Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other members of the Class purchased AutoTrader's subscription advertisement listings and executed an Agreement.  The Agreement includes a choice of law clause specifying that the Agreement is to be construed under the laws of the State of Georgia without reference to its conflict of law principle.  The terms of that contract include the promises and affirmations of fact made by Defendant in its marketing, advertising and promotion of its

advertisement listings.   The Agreement and AutoTrader's marketing and advertising became part of the basis of the bargain and are part of the standardized contract between Plaintiff and the members of the Class and Defendant.

138.  Defendant AutoTrader materially breached its agreements with Plaintiff and the Class by failing to provide the advertising reach and effectiveness as represented to Plaintiff and the Class.

139.  The agreement between the parties, like all contracts subject to Georgia law, and the law of each state within the United States, contains an implied covenant of good faith and fair dealing.

140.  By its conduct alleged herein, AutoTrader, through its agents and employees, has breached the implied covenant of fair dealing.   AutoTrader, through its agents and employees, has acted to deny the Plaintiff and  Class members the reasonably expected benefits under the agreements.

141.  As a direct and proximate result of Defendant's breach, Plaintiff and Class members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 4
## NEGLIGENT MISREPRESENTATION

142.   Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-141 above.

143.   Plaintiff brings this claim individually and on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes.

144.   During the relevant period, Defendant made false representations in its SRP and VDP performance number reports, Dealer Scorecards and/ or Performance Tracker Reports regarding the advertising reach achieved through AutoTrader's online listings to Plaintiff and the Class.   As described herein, Defendant's representations were untrue.

145.   When Defendant made the representations set forth above, it had no reasonable grounds for believing them to be true.

146.   Plaintiff and Class members, at the time the representations were made by Defendant, and at the time Defendant took the actions herein alleged, were ignorant of the falsity of the representations and believed them to be true.  In reliance on these representations, Plaintiff and the Class were induced to and did pay monies to purchase Defendant's subscription advertisement listings.

147.   Had Plaintiff and the Class known the truth about the reach of AutoTrader's subscription advertisement listings, they would not have purchased the product.

148.   As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the Class paid monies to Defendant, through Defendant's regular sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

149.   Plaintiff and the Class seek the recovery of a large portion of their purchase monies, plus prejudgment interest, and reasonable attorneys' fees and costs as will be determined at the time of trial.

### COUNT 5
### UNJUST ENRICHMENT

150.   Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-149 above.

151.   Plaintiff brings this claim individually and on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes.

152.   Plaintiff and the Class conferred a benefit upon Defendant by purchasing AutoTrader's subscription premium listings and/or enhanced services.

153.   Defendant accepted the benefits conferred upon it by the Plaintiff and the Class. Defendant's acceptance and benefit conferred upon it as a result of the

payment by Plaintiff and the Class is an unjust enrichment because such benefit was procured through unlawful and deceptive means, misrepresentations, and/or fraud.

154. Defendant has been unjustly enriched at the expense of the Plaintiff and the Class.

155. Plaintiff and the Class are entitled to damages as a result of Defendant's unjust enrichment, including the disgorgement of all profits earned by the Defendant as a result of the foregoing.

## COUNT 6
## INTENTIONAL MISREPRESENTATION

156. Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-155 above.

157. Plaintiff brings this claim individually and on behalf of the Nationwide Class and, in the alternative, on behalf of the State Classes.

158. During the relevant period, and/or at least during the time period of January 2015 through June 2015, Defendant intentionally made false representations in and regarding the accuracy of its SRP and VDP performance numbers, Dealer Scorecards and/ or Performance Tracker Reports reported to Plaintiff and members of the Class.   As described herein, Defendant's representations were untrue.

159.  Defendant made the representations herein with the intention of inducing the public, including Plaintiff and members of the Class, to purchase AutoTrader's premium listings and enhanced services.

160.  Defendant intentionally made such misrepresentations by intentionally inflated performance numbers reported to Plaintiff and the Class.

161.  Defendant knew that its SRP and VDP performance numbers, Dealer Scorecards and/ or Performance Tracker Reports reported to Plaintiff and the Class were inaccurately and grossly inflated as a result of its inaccurate counting, but nevertheless made such representations with the intention and belief that Plaintiff and the Class would rely on Defendant's misrepresentations.

162.  Plaintiff and Class members, at the time the reports were made available by Defendant, and at the time Defendant took the actions herein alleged, were ignorant of the falsity of the representations and performance numbers reported therein and believed them to be true.  In reliance on these representations, Plaintiff and the Class were induced to and did pay monies to purchase Defendant's subscription advertisement listings.

163.  Had Plaintiff and members of the Class known the truth about the reach of AutoTrader's subscription advertisement listings, they would not have purchased the product.

164.   As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the Class paid monies to Defendant, through Defendant's regular sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

## COUNT 7
## PUNITIVE DAMAGES

165.   Plaintiff realleges, as if fully set forth herein, the allegations of paragraphs 1-164 above.

166.   Defendant's tortious and unlawful acts, as described in this Complaint, have been committed with the specific intent to injure Plaintiff and the Class.

167.   Defendant's misconduct was intentional, deliberate, malicious, willful, and designed to injure, and shows that entire want of care that raises the presumption of conscious indifference to the consequences of their actions.

168.   Plaintiff, on behalf of itself and the Class requests, pursuant to O.C.G.A. § 51-12-5.1, that punitive damages be awarded against Defendant in an amount to be determined by the enlightened conscience of an impartial jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully request that the Court enter judgment in their favor that:

A.      Certifies the Class requested, designates any appropriate subclasses, appoints Plaintiff as class representative of the applicable Class and Liaison Counsel and Co-Lead Counsel representing Plaintiff as Class Counsel;

B.      On behalf of Plaintiff and the Class, enters judgment against AutoTrader's unfair and/or deceptive trade practices and common law violations;

C.      Awards Plaintiff and the Class appropriate monetary relief, including actual and statutory damages, punitive and exemplary damages under applicable law, restitution, and disgorgement, in an amount to be determined at trial;

D.      Orders AutoTrader to notify the Class about the inflation of SRP and VDP;

E.      Orders AutoTrader to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

F.     Awards Plaintiff and the Class pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses allowable by law; and

G.     Awards such other and further relief as this Court may deem just and proper.

## VI.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

| Dated: June 29, 2016 | Respectfully submitted, |
|---|---|
|  |  /s/ Zahra S. Karinshak<br>Zahra S. Karinshak<br>Georgia Bar No. 407911<br>Jonathan E. Hawkins<br>Georgia Bar No. 338779 |
| **KREVOLIN & HORST, LLC**<br>One Atlantic Center, Suite 3250<br>1201 West Peachtree Street, NW<br>Atlanta, GA 30309<br>(404) 888-9700<br>(404) 888-9577 (facsimile)<br>Karinshak@khlawfirm.com<br>Hawkins@khlawfirm.com | ***Local Counsel for Plaintiff B&Z Auto Enterprises, LLC d/b/a/ Riverdale Chrysler Jeep d/b/a Eastchester Chrysler Jeep Dodge d/b/a New York Cars Direct d/b/a New York Autos Direct*** |
|  | **-And-** |
|  |  |
| **MILBERG LLP**<br>One Pennsylvania Plaza, 49th Floor | Kristi Shanke McGregor<br>Georgia Bar No. 674012<br>Andrei Rado<br>(Application for *pro hac* admission to |

| | |
|---|---|
| New York, NY 10119<br>(212) 594-5300<br>kmcgregor@milberg.com<br>arado@milberg.com<br>jczeisler@milberg.com | be filed)<br>Jennifer Cziesler<br>(Application for *pro hac admission* to be filed) |
| **BELLAVIA BLATT & CROSSETT, PC**<br>200 Old Country Road, Suite 400<br>Mineola, NY 11501<br>Tel: (516) 873-3000<br>lbellavia@dealerlaw.com<br>sblatt@dealerlaw.com | Leonard A. Bellavia<br>(Application for *pro hac* admission to be filed)<br>Steven H. Blatt<br>(Application for *pro hac* admission to be filed) |
| | *Attorneys for Plaintiff B&Z Auto Enterprises, LLC d/b/a/ Riverdale Chrysler Jeep d/b/a Eastchester Chrysler Jeep Dodge d/b/a New York Cars Direct d/b/a New York Autos Direct* |